IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DEWITT TAYLOR,** | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | **CIVIL NO.1:CV-08-1610** |
| **JFC STAFFING ASSOCIATES;** | : | |
| **KAREN GOTH; JAMIE SCOTT** | : | |
| **DENNIS SHAMBAUGH; and** | : | |
| **JAMES ZIMMERMAN,** | : | |
| | : | |
| **Defendants** | : | |

**M E M O R A N D U M**

The captioned matter is a civil rights case where Plaintiff invokes a panoply of causes of action against various Defendants. Specifically, Plaintiff brought suit pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, ("Title VII") and the Pennsylvania Human Relations Act, 43 Pa. Stat. Ann. § 951, *et seq.*, ("PHRA"), as well as, 42 U.S.C. §§ 1981, 1983, and 1985. Plaintiff also brings state law claims of intentional infliction of emotional distress and civil conspiracy.

Before the court is (1) Defendants' JFC Staffing Associates, ("JFC"), Karen Goth, Jamie Scott, and Dennis Shambaugh's motion for summary judgment. (Doc. 27); and (2) Defendant Brian Zimmerman's motion to dismiss Plaintiff's Second Amended Complaint. (Doc. 22.) Both motions are fully briefed and ripe for disposition by the court.

**I.**     <u>**JFC, Goth, Scott, and Shambaugh's motion for summary**</u>
<u>**judgment**</u>

**A.**     <u>**Facts**</u>

The following facts are undisputed except where noted.[1]  Plaintiff

Dewitt Taylor was employed by JFC from May 2006 until April 2007.  (Doc. 27-3,

Defs.' Ex. C., Karen Goth Aff. ¶¶ 3, 28.)  Taylor, an African-American male, was

assigned by JFC to work at TransCore as a customer service employee.  (Defendants'

Statement of Material Facts ("SMF") ¶ 2.)  While working at TransCore, Taylor was

an employee of JFC and was paid by JFC.  (*Id.* ¶ 3.)  Taylor's supervisor was

Defendant Jamie Scott, a JFC employee.  (*Id.* ¶ 4.)

On April 6, 2007, Jennifer Cron, another JFC employee and co-worker

of Taylor, left a birthday card for Taylor at his work station.  (*Id.* ¶ 5.)  The birthday

card was hand drawn, and stated:

> **Outside:** "Happy Birthday 2 You"
> **Inside left side:** " happy Birthday To you. [sic].  happy Birthday To
> you. [sic].  You Look Like a Monkey and you Smell Like
> one to. [sic].  He He He.  Happy 29 Looking Good. He He He
> **Inside right side:** "DeWitt, hope you had a great and Wonderful
> Birthday From Jennifer
> **Back (written in a circle):** OVER THE HILL.COM  **(inside the circle
> of words):** 29 Forever.

(Doc. 27-3, Defs.' Ex. A, Heidi Vega Aff., Ex. A (photocopy of card).)  Taylor found

the card offensive.  (Doc. 51, Pl.'s Ex. 1, Dep. of Dewitt Taylor, 18:19-20.)  Upon

---

[1]In *Forbes v. Twp. of Lower Merion*, 313 F.3d 144, 148–49 (3d Cir. 2002), the Third Circuit reaffirmed its supervisory rule first announced in *Vadino v. A. Valey Engineers,* 903 F.2d 253, 259 (3d Cir. 1990) that "the district courts in this circuit [must] accompany grants of summary judgment hereafter with an explanation sufficient to permit the parties and this court to understand the legal premise for the court's order."  *Vadino*, 903 F.2d at 259.  Here, the court will identify those facts that are subject to genuine dispute, and cite to the record in order to highlight the precise nature of any disputed facts.  The court will not cite to the record where the facts are undisputed; instead, the court will rely on the statements of material fact and admissions submitted by the parties.  The materiality of any genuinely disputed facts will be analyzed in the discussion section below.

receiving the card, Taylor took it to Heidi Vega, a TransCore employee, and explained to Vega that the card upset him. (*Id.* at 21:13-20.) Vega made a copy of the card and told Taylor that she would contact JFC and pass his complaint along. (*Id.* at 21:16-24.)

On April 9, 2007, after hearing nothing from JFC, Taylor again went to Vega who called Jamie Scott, Taylor's supervisor at JFC. (*Id.* at 22:10-21.) During this phone call, Vega explained to Scott what she knew about the situation. (*Id.*) The next day, a meeting was held with Taylor, Vega, Scott, and two other JFC employees. (SMF ¶ 8.) The JFC employees present at the meeting listened to Taylor, and told him that their investigation up to that point did not reveal any malicious intent by Jennifer Cron, but that they would nonetheless address the issue with Cron directly. (SMF ¶ 9.) On April 12, 2007, Jamie Scott and Karen Goth—the director of human resources at JFC—met with Taylor to advise him of the actions that they had taken in response to his complaint. (Doc. 27-3, Defs.' Ex. C, Karen Goth Aff., ¶ 1, 13.) Specifically, they told him that based on JFC's investigation they would review and reaffirm with Jennifer Cron JFC's anti-harassment and anti-hostile work environment policies, and that Cron would be disciplined. (*Id.*) At the end of that meeting, Taylor expressed his appreciation for the outcome of the meeting and the plan to meet with Cron. (*Id.*, ¶ 13; Doc. 27-3, Defs.' Ex. J, Taylor Dep. ¶ 34:25-35:10.) Cron was formally disciplined by JFC on April 13, 2007. (Goth Aff. ¶¶ 15-16.) That day, Cron met with Goth for approximately one hour to review JFC's diversity training, she was given examples of different situations that she needed to be mindful of in the workplace, and she reviewed JFC's anti-harassment policy. (*Id.*). She was also given a written warning.

(Doc. 35, Defs.' Ex. B, Aff. of Jamie Scott, Ex. A (Written Warning).) On April 17, 2007, Taylor again told Jamie Scott that he did not believe that JFC was taking the matter seriously. Taylor was unhappy with the fact that Cron was given only a written warning, he wanted JFC to suspend Cron. (Doc. 27-3, Defs.' Ex. J, Taylor Dep. at 30:6-17; Doc. 27-1, Defs.' Ex. C, Karen Goth. Aff. ¶ 22.)

Defendants contend that beginning April 10, 2007, Taylor's behavior at work became generally disruptive to TransCore's operations. For instance, Heidi Vega states in her affidavit that "[Taylor's] conduct was so disruptive that I began hearing complaints from the staff about his behavior." (Doc. 27-3, Ex. A, Heidi Vega Aff. ¶ 10). Jamie Scott states in her affidavit that "[s]ince April 10, 2007, [Taylor's] behavior had become disruptive to Transcore's operations and Transcore management wanted to discuss assignment options." (Scott Aff. ¶ 15.)

In addition to vague allegations of disruption, Defendants have also provided specific examples of Taylor's behavior that they found troubling. Vega states in her affidavit that "[o]n or about April 16, 2007, [Taylor] discussed . . . [the then recent] Virginia Tech shooting incident and expressed empathy with the shooter because no one took him seriously either." (Vega Aff. ¶ 11.) Vega also states that one staff member who overheard these comments decided not to come back to work for TransCore because he was so concerned. (*Id.* ¶ 13.) Furthermore, Jamie Scott states that at an April 18, 2007 meeting with Taylor to address his recent disruptive behavior, "Taylor became agitated and began to pound his fists on the table and began to again threaten Jennifer Cron's safety." (Scott Dep. ¶ 17.) Finally, Kim Turns—an administrative operations supervisor for TransCore—provides further examples of Taylor's disruptiveness. She states that after the events in question,

4

Taylor would have meltdowns from time to time "in which he would be outside my office slamming things, huffing and puffing and walking hard as through his feet were slamming into the ground." (Doc. 27-3 Defs.' Ex. D, Kim Turns Aff. ¶ 4.) Taylor would "comment to other employees as they passed regarding his situation." (*Id.* at ¶ 6.) Finally, Turns states the following:

> On one occasion shortly after the Virginia Tech shootings he mentioned that he identified with the shooter because people[] weren't taking him seriously either and people should listen to people and need to pay attention to one another. As [Taylor] told me this he balled up his fists and he began shaking them.

(*Id.* at ¶¶ 12-13.) For his part, Taylor denies generally that he was disruptive at TransCore or JFC, and specifically denies that he ever mentioned anything about the Virginia Tech shootings. (Doc. 51, Pl.'s Ex. 1, Taylor Dep. at 84:9-85:22.)

As a result of the meeting that took place on April 18, 2007, Taylor was sent home for the balance of the day with pay. (SMF ¶ 19.) That evening, shortly after 5:00 p.m., on April 18, 2007, Goth telephoned Taylor and terminated his assignment with TransCore and his employment with JFC. (SMF ¶ 20.) Goth told Taylor that he was not permitted to return to JFC or TransCore. (Goth Aff. ¶ 28; Doc. 27-3, Defs.' Ex. J, Taylor Dep. at 44:19-21.) Goth informed Taylor that he was being terminated because of his threats to Cron, and his discussions with co-workers about the April 16, 2007, Virginia Tech shootings. (Goth Aff. ¶ 30.) Goth explained to Taylor that his personal belongings would be packed up and sent to him by overnight delivery. (*Id.* ¶ 31; Doc. 27-3, Defs.' Ex. J, Taylor Dep. at 45:14-21.) That evening, Taylor called the Swatara Township Police Department and spoke with Defendant Zimmerman—a sergeant with the police department. (Doc. 51, Pl.'s Ex. 1, Taylor Dep. 65:8-66:3.) Taylor requested that Zimmerman send a police

5

officer to TransCore to accompany Plaintiff to retrieve his possessions. (*Id.*) Taylor did not tell Zimmerman that JFC had offered to pack his possessions and overnight them to him. (*Id.*) Zimmerman told Taylor to call the police department the next day, and that they would send an officer along to accompany him to TransCore. (*Id.*)

The next day—April 19, 2007—Taylor called Vega and told her that he was coming in to pick up his possessions. (*Id.* at 62:12-63:9; Vega Aff. ¶ 17.) Vega told Taylor that she had received an e-mail advising her that Taylor was not permitted on the property. (Doc. 51, Pl.'s Ex. 1, Taylor Dep. at 62:18-22; Vega Aff. ¶ 18.) Vega warned Taylor not to come to the property because if he did she would be forced to call the police; instead, she offered to pack his possessions for him and overnight them to him. (Vega Aff. ¶¶ 18, 22.) Taylor told Vega that he would be arriving with a police escort. (Doc. 51, Pl.'s Ex. 1, Taylor Dep. at 62-68.) Later that morning, Taylor arrived at TransCore where he met Swatara Township police officer Jason Lex. (*Id.* at 67:2-4.) Lex was sent by Zimmerman. (*Id.* at 66:17-67:4.) When Taylor arrived he and Defendant Dennis Shambaugh got into an argument about whether Taylor was supposed to be there. (Doc. 27-3, Ex. J, Taylor Dep. at 51:10-13.) Both Taylor and Shambaugh explained their version of the events to Lex. According to Shambaugh, Lex explained that Taylor's actions were consistent with the crime of trespassing and asked Shambaugh to press charges, which he did. (Doc. 27-3, Defs.' Ex. E, Dennis Shambaugh Aff. ¶ 9.) Prior to April 19, 2007, Shambaugh had never had any conversations with either Lex or Zimmerman. (*Id.* at ¶¶ 10-11.) Plaintiff was charged with summary trespassing, and appeared before Magisterial District Judge Michael J. Smith on June 14, 2007. (Doc. 27-3, Defs.' Ex. J, Taylor Dep. at 56:18-20.) Taylor was represented at this hearing by an attorney.

(*Id.* at 21-22.)  Taylor agreed to perform fifteen hours of community service in exchange for the record being expunged.[2]  (*Id.* at 57:19-58:11.)  Taylor completed his community service, and his arrest record was expunged.  (*Id.* at 58-11-12.)

## B.    Procedural History

Taylor commenced this case by filing a complaint against Defendants JFC Staffing, Scott, Goth, and Shambaugh on August 27, 2008.  (Doc. 1.)  Taylor filed an Amended Complaint on September 12, 2008, (Doc. 3), and a Second Amended Complaint on May 1, 2009, (Doc. 17).  In his Second Amended Complaint, Taylor added Zimmerman as an additional defendant.  On September 3, 2009, Defendants JFC Staffing, Scott, Goth and Shambaugh filed a motion for summary judgment, supporting documents, and a statement of material facts.  (Docs. 27-28.)  After being granted leave of court to submit a late filing, Defendants filed their brief in support of their motion for summary judgment on September 15, 2009. (Doc. 38.)  Plaintiff filed his brief in opposition to summary judgment on October 13, 2009, along with is answer to Defendants' statement of material facts, and his exhibits.  (Docs. 48-51.)  Defendants' reply brief was filed on October 26, 2009. (Doc. 52.)  On December 11, 2009, with leave of court, Plaintiff re-filed his exhibits because of a docketing error.  (Doc. 54).  Defendants' motion for summary judgment is fully briefed and is ripe for disposition.

## B.    Legal Standard for Summary Judgment

---

[2]The record is unclear about the exact nature of Taylor's agreement to perform community service, but Taylor himself admits that involved a *quid pro quo*: he had to complete the community service before his arrest record would be expunged.  (Doc. 27-3, Defs.' Ex. J, Taylor Dep. at 58:4-12; 59:8-16.)

"In an employment discrimination case, the burden of persuasion on summary judgment remains unalterably with the employer as movant. The employer must persuade [the court] that even if all of the inferences which could reasonably be drawn from the evidentiary materials of record were viewed in the light most favorable to the plaintiff, no reasonable jury could find in the plaintiff's favor." *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 362 (3d Cir. 2008).

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *accord Saldana v. Kmart Corp.*, 260 F.3d 228, 231-32 (3d Cir. 2001). A factual dispute is "material" if it might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party. *Id.* at 248. The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party. *Saldana*, 260 F.3d at 232; *see also Reeder v. Sybron Transition Corp.*, 142 F.R.D. 607, 609 (M.D. Pa. 1992).

Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations in its complaint. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* (internal

quotations omitted); *see also Saldana*, 260 F.3d at 232 (citations omitted). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial." *Celotex*, 477 U.S. at 322-23. "'Such affirmative evidence– regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance.'" *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

### D.  Discussion

#### 1.  Title VII, PHRA, and 42 U.S.C. § 1981 claims against Defendant JFC

Plaintiff brings claims under Title VII, the PHRA, and 42 U.S.C. § 1981 against Defendant JFC. Because the legal standard for each of these claims is the same, the court will address them collectively.[3] Title VII prohibits an employer from discharging an employee based on, among other things, his race. *See* 42 U.S.C. § 2000e-2(a)(1). In *McDonnell Douglas*, the Supreme Court created a three-part structure for the presentation of evidence in Title VII cases where the Plaintiff does not have direct evidence of discrimination. *See McDonnell Douglas Corp. v. Green*,

---

[3]In addition to claims under Title VII, Taylor also brought claims against Defendants pursuant to the Pennsylvania Human Relations Act, 43 Pa. Stat. Ann. § 951 *et seq.* and 42 U.S.C. § 1981. The standard for analyzing whether Plaintiff has stated a PHRA claim is identical to the standard for Title VII claims because Pennsylvania courts have construed the protections of the two acts interchangeably. *See Weston v. Pennsylvania*, 251 F.3d 420, 426 n. 3 (3d Cir. 2001) (citations omitted); *see also Frog, Switch & Mfg. Co. v. Pa. Human Relations Comm'n*, 885 A.2d 655, 660 n. 4 (Pa. Commw. Ct. 2005). Similarly, those legal principles guiding a court in a Title VII dispute apply with equal force in a § 1981 action. *See Ocasio v. Lehigh Valley Family Health Ctr.*, 92 F. App'x 876, 879 (3d Cir. 2004) (citing *Manatt v. Bank of Am.*, 339 F.3d 792, 797 (9th Cir. 2003)). The only difference between the legal standards for § 1981 claims and Title VII claims is one of the elements of the prima facie test. The court discusses these differences in detail in footnote 6, *infra*, because, in this case, the difference is dispositive of Plaintiff's § 1981 claim.

411 U.S. 792, 802 (1973). To survive summary judgment, the plaintiff must first produce evidence that is sufficient to convince a reasonable factfinder to find all of the elements of a prima facie case of discrimination. *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997). If the plaintiff offers sufficient proof of a prima facie case, step two is reached. The burden of production—but not the burden of persuasion—shifts to the defendant, who must then offer evidence that is sufficient, if believed, to support a finding that it had a legitimate, nondiscriminatory reason for discharging the employee. *Keller*, 130 F.3d at 1108. If the defendant cannot satisfy this burden, summary judgment must be denied.

On the other hand, if the defendant does satisfy this burden, step three is reached. The plaintiff may then survive summary judgment only by "submitting evidence 'from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" *Id.* (quoting *Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir. 1994).)

In his Second Amended Complaint, Taylor asserts that Defendant JFC Staffing violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.,* but it is unclear whether he is asserting a discrimination claim under § 2000e-2(a), the anti-discrimination provision, or a retaliation claim under the anti-retaliation provision in § 2000e-3(a). Defendants address both claims in their motion for summary judgment, and the court will address both claims here.

### a.  Discrimination Claim

Although it is not entirely clear from Plaintiff's Second Amended Complaint, it appears that Taylor argues that JFC is liable under Title VII and the PHRA because it acquiesced in the racial harassment by Cron. (*See* Doc. 17 ¶ 39.) In essence, Taylor asserts that he suffered a racially hostile work environment because of JFC's inadequate handling and investigation of the racially offensive card that Taylor received from Cron. To support such a claim, Taylor has an obligation, in opposing summary judgment, to come forward with evidence supporting a prima facie case. Specifically, he must demonstrate: (1) he suffered intentional harassment based on race; (2) the harassment was severe or pervasive;[4] (3) the harassment detrimentally affected him; (4) the harassment would have detrimentally affected a reasonable person in like circumstances; and (5) there is a basis for employer liability. *See Jensen*, 435 F.3d at 444. The court need not concern itself with the first four factors of Taylor's prima facie case because Defendants have implicitly conceded them by not mentioning them in their brief in support of summary judgment; instead, Defendants focus only on the fifth and final prong. Thus, the court will address whether there is a basis for employer liability.

---

[4]The Third Circuit has often stated that discriminatory harassment must be "severe and pervasive." *See e.g., Cardenas v. Massey*, 269 F.3d 251, 260 (3d Cir. 2001); *West v. Phila. Elec. Co.*, 45 F.3d 744, 753 (3d Cir. 1995); *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir. 1990). But the Supreme Court's standard is "severe or pervasive." *Pa. State Police v. Suders*, 542 U.S. 129, 133 (2004). As the Third Circuit recognized in *Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006), *overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co., v. White,* 548 U.S. 53 (2006), "the difference is meaningful, and the Supreme Court's word controls." *Id.* at n. 3. By using the disjunctive "or" the Supreme Court clearly meant that "severe" and "pervasive" are alternative possibilities. In other words, some conduct, although isolated and sporadic, may be severe enough to contaminate the workplace; whereas, other, less objectionable, conduct must be pervasive in order to contaminate the workplace such that it meets the threshold under the second prong of a hostile work environment claim.

Employer liability for a racially hostile work environment caused by an employee is not automatic. *See Meritor Savings Bank v. Vinson,* 477 U.S. 57, 72 (1986) (directing that agency principles be used as guidance in determining employer liability for a hostile work environment created by employees). In elaborating on the Supreme Court's deference to principles of agency law, the Third Circuit has recognized three potential bases in the *Restatement (Second) of Agency* for holding employers liable for harassment committed by their employees. First, "employers are liable for the torts committed by employees within the scope of their employment." *Knabe v. Boury*, 114 F.3d 407, 411 (3d Cir. 1997). This is not a factor in this case. There is no indication from the parties or the record that any torts were committed by Cron or any other employee of JFC, and much less that anything was done within the scope of Cron's employment with JFC. Moreover, the Third Circuit has recognized that this theory of liability is inapposite in hostile work environment cases where "the harasser is not explicitly raising the mantle of authority to cloak the plaintiff in an unwelcome atmosphere." *Bouton v. BMW of N.A. Inc.,* 29 F.3d 103, 107 (3d Cir. 1994.)

The other two agency theories through which a plaintiff can hold an employer liable for a racially hostile work environment are: (1) where an employer was negligent in its failure to discipline or fire, or failure to take remedial action upon notice of harassment; and, (2) where the harassing employee relied upon apparent authority or was aided by the agency relationship. *Knabe*, 114 F.3d at 411 (citing *Bouton,* 29 F.3d at 106). Here, there is simply no evidence that Cron—in sending the racially offensive birthday card—relied upon any apparent authority or that JFC in any way aided her in making or sending the racially offensive card.

Thus, any liability of JFC for the conduct of Cron hinges upon whether JFC was negligent in failing to take the appropriate remedial action upon notice of the harassment. Based upon the record before it, even viewing the evidence in the light most favorable to Taylor, the court concludes that the actions taken by JFC, once it became aware of the racially offensive card, were reasonably calculated to stop further harassment.

On Friday, April 6, 2007, Taylor advised his TransCore supervisor, Heidi Vega, that he received a birthday card that he deemed racially offensive. On Monday, April 9, 2007, JFC had already begun the investigation as to what had transpired, including having several separate meetings with Taylor and Cron. After their investigation, JFC concluded that Cron's actions were not taken with the intent to discriminate or harass Taylor, but rather Cron believed the card to be harmless. Nonetheless, on April 13, 2007—a mere six days after the alleged harassment occurred—Cron was disciplined by receiving a written warning and a counseling session about JFC's anti-harassment and anti-hostile work environment policies. The court concludes that these actions were reasonably calculated to prevent future instances of racial harassment by Cron and others, and, thus, sufficient as a matter of law to avoid liability. *See Huston v. P&G Paper Prods. Co.,* 568 F.3d 100, 110 (3d Cir. 2009) ("An employer's remedial action is adequate if it is reasonably calculated to prevent further harassment." (citations omitted)); *Knabe*, 114 F.3d at 414 ("So long as the remedy is reasonably calculated to prevent future instances of harassment, the company cannot be held liable under a negligence theory of agency.")

For his part, Taylor asserts Cron should have been suspended rather than merely reprimanded, and that it is best left to the jury to determine whether the actions of JFC were appropriate. The court disagrees. So long as the "the remedy chosen by the employer is adequate, an aggrieved employee cannot object to the selected action. . . . [and] and employee cannot dictate that the employer select a certain remedial action." *Knabe,* 114 F.3d at 414. Here, JFC took steps to address the conduct complained of, this is all that is required of an employer to defeat liability for a racially hostile work environment under Title VII. Consequently, JFC is entitled to summary judgment as to Taylor's claim of a racially hostile work environment.

### b. Retaliation Claim

### i. Prima facie case

Taylor's Second Amended Complaint also asserts a retaliation claim. Specifically, Taylor claims that JFC retaliated against him by terminating his employment because he insisted that JFC mete out a harsher discipline of Cron.[5] Defendants argue that Taylor has failed to establish a prima facie case of retaliation. Under the anti-retaliation provisions of Title VII, a plaintiff must come forward with some evidence establishing that a prima facie case of retaliation exists. "To establish a prima facie case of retaliation . . . a plaintiff must tender evidence that '(1) [he] engaged in activity protected by Title VII; (2) the employer took an adverse employment action against [him]; and (3) there was a causal connection between

---

[5]It is unclear from Plaintiff's Second Amended Complaint whether he asserts that JFC is liable under Title VII and the PHRA for the trespassing charge that was filed against him. In any event, since there is no connection between this charge and Plaintiff's employment with JFC this action, even if JFC were responsible for it, would not constitute an adverse employment action which is necessary for liability under Title VII.. *See Moore v. City of Phila.,* 461 F.3d 331, 340-41 (3d Cir. 2006)

[his] participation in the protected activity and the adverse employment action.'" *Moore v. City of Phila.,* 461 F.3d 331, 340-41 (3d Cir. 2006) (*quoting Nelson v. Upsala Coll.,* 51 F.3d 383, 386 (3d Cir. 1995)).

Here, Defendants have conceded that Taylor has met the first two prongs of his prima facie retaliation claim. (Doc. 38, Defs.' Br. in Supp. of Mot. for Summ. J at 6.) However, Defendants argue that Taylor cannot demonstrate that there is a causal connection between his termination and his protected activity. While the court agrees with Defendants that Taylor offers little evidence to support his claims, the court finds that the temporal proximity of his protected activity to his termination is sufficient—standing alone—to overcome his burden of producing evidence of a prima facie case of retaliation in opposition to summary judgment.

It is true that Taylor offers little evidence in support of his claims, and that most of what he does offer is conclusory. For example, in his brief in opposition to Defendants' motion for summary judgment, Taylor states the following:

> Upon information and belief, the actions of JFC Staffing Associates and the individual defendants was intended to retaliate against the Plaintiff and punish him for complaining about the racially offensive treatment that he received from other fellow employees who were employed by and supervised by defendant JFC Staffing Associates.

(Doc. 49, Pl.'s Br. in Opp. to Mot. for Summ. J. at 10.) Taylor later states "Taylor must make out his case. Upon the facts developed in this litigation he has done so. He was the victim of workplace harassment. He was then retaliated against by his supervisors because he complained about the harassment." (*Id.* at 16.) Nowhere does Taylor provide support for these conclusory allegations. In opposing summary judgment, Taylor cannot simply sit back and rest on the allegations contained in his complaint. Instead, Taylor must "go beyond the pleadings and by [his] own

affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotations omitted). Here, Taylor has provided no evidence that would permit a jury to *directly* conclude that there was a causal connection between his termination and the decision to charge him with trespassing and his complaint about the card he received from Cron and JFC's investigation of the incident.[6] Nonetheless, despite the lack of direct evidence from Taylor, there is sufficient circumstantial evidence in the record from which a jury could reasonably conclude there was a causal connection between his protected activity and his termination. Specifically, the court finds that the temporal proximity between these events is sufficient to create a genuine issue of material fact precluding summary judgment.

The Third Circuit has held that "[w]here the temporal proximity between the protected activity and the adverse action is 'unusually suggestive,' it is sufficient standing alone to create an inference of causality. *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007) (citing *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (temporal proximity alone, when "very close," can in some instances establish a prima facie case of retaliation)); *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) (reversing summary judgment in

---

[6]It is true that Taylor submitted an affidavit in opposition to summary judgment, but this affidavit is laden with conclusory rather than factual statements. For instance, Taylor states that "the defendants treated me as if I did something wrong to create an excuse to fire me." (Doc. 54, Pl.'s Ex. 5, Declr. of DeWitt Taylor, ¶ 2.) This is a conclusory statement not a factual statement, simply because Taylor believes that this is true does not make it so; instead, Taylor must produce facts from which a jury could draw this conclusion. Simply stating the conclusion is not enough. Other statements in Taylor's declaration suffer the same fatal flaws. For instance, he states that "[t]his entire matter was from the racist card incident and because I threatened Scott I'm going to the PHRC and EEOC." (*Id.* ¶ 9.) Again, this is a conclusion not a fact.

favor of the defendant where plaintiff had been discharged two days after his employer's receipt of his EEOC claim). However, where the temporal proximity is not "unusually suggestive," the court "ask[s] whether the proffered evidence, looked at as a whole, may suffice to raise the inference." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000) (internal citation and quotation marks omitted). "Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity, a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment." *Leboon* 503 F.3d at 233 (citing *Clark County Sch. Dist.* 532 U.S. at 273 (itself citing favorably *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir.1997), which rejected such an inference where the events were three months apart); *Andreoli v. Gates*, 482 F.3d 641, 650 (3d Cir.2007) (five-month time period between employee's complaint and first adverse action was, without additional evidence, insufficient to raise an inference of causation). Here, the gap between the protected activity and the adverse action was only twelve days. Given the precedent discussed above, the court is constrained to conclude that the temporal proximity of twelve days is sufficiently "unusually suggestive" to overcome Taylor's obligation of producing evidence of a causal connection between his protected activity and the adverse action.[7] Thus, despite the lack of other evidence, the close

---

[7] Although the court concludes that Taylor has met his prima facie burden under Title VII and the PHRA, he has not met his burden under Section 1981. While the court noted in footnote 3, *supra*, that the elements of a Section 1981 claim and a Title VII claim are identical, that is true in all respects except one prong of the prima facie case. Under Title VII, the third prong of a prima facie case is whether there is a causal connection between the protected activity and the adverse action. *See Moore,* 461 F.3d at 340-41. However, under § 1981, Taylor must produce evidence of "discrimination concerning one or more of the activities enumerated in the statute. . ." *Brown v. Phillip Morris, Inc.*,

(continued...)

temporal proximity of the adverse action to Taylor's protected activity is sufficient to overcome Taylor's burden of producing evidence in support of his prima facie case of retaliation. Accordingly, the court will address the other *McDonnell Douglas* factors.

### ii. Non-discriminatory reasons

Once a plaintiff offers sufficient proof of a prima facie case, a court must analyze step two of the *McDonnell Douglas* framework where the burden of production—but not the burden of persuasion—shifts to the defendant, who must offer evidence that is sufficient, if believed, to support a finding that it had a legitimate, nondiscriminatory reason for discharging the employee. *See Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997). If the defendant

---

[7](...continued)
250 F.3d 789, 797 (3d Cir. 2001). Section 1981 states, in relevant part:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a). None of the activities references above is implicated in this case. There is simply no evidence that this case involves a contract between any of the parties or any of the other protected activities. While Defendants' assertion of this defense is vague at best, the court as gatekeeper, will not permit a claim to go to the jury where there is absolutely no allegation contained in the complaint or no evidence adduced in the record supporting the claim. Merely stating that § 1981 was violated does not make it so. Thus, the court concludes that Taylor has failed to produce any evidence that he is protected by the statute in his employment and termination from JFC, and the court will grant summary judgment as to Taylor's § 1981 claim against Defendants JFC, Shambaugh, Goth, and Scott.

cannot satisfy this burden, summary judgment must be denied. Here, Defendants have asserted, both at the time of termination and throughout this litigation, that Taylor's behavior during the course of the investigation caused a general disruption to the operations at TransCore, particularly after he made several comments concerning the Virginia Tech shootings. These are legitimate, non-discriminatory grounds for termination, thus, Defendants have met their burden of production.

### iii.  <u>Pretext</u>

Once an employer has come forward with evidence of a legitimate, non-discriminatory grounds for termination then the burden shifts back to the plaintiff to demonstrate that these grounds were pretextual. Accordingly, Taylor may survive summary judgment only by "submitting evidence 'from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" *Id.* (quoting *Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir. 1994).)

Defendants have supported their assertions that Taylor's behavior and threats caused his termination with affidavits from four different individuals. For his part, Taylor says that each of these individuals is mistaken. In his affidavit, Taylor states that "I never at any time threatened any of the defendants with violence or retaliation for the racism I experienced or for any other reason. I was never disruptive in the work place or anywhere else." (Doc. 54, Pl.'s Ex. 5, DeWitt Taylor Declr. ¶ 1.) While Taylor's denial that he was "never disruptive" is fairly general, it is no more general than the affidavits submitted by Defendants. For instance, Heidi Vega states in her deposition that "[Taylor's] conduct was so disruptive that I began

hearing complaints from the staff about his behavior." (Vega Aff. ¶ 10.) Jamie Scott stated that "[Taylor's] behavior became disruptive," (Scott Aff. ¶ 13), although she later states that he "began to pound his fists on the table and began to again threaten Jennifer Cron's safety." (*Id.* ¶ 17.) Karen Goth described Taylor's behavior as "furious" and "causing . . . disruption to the workforce at TransCore.," (Goth Aff. ¶ 24), and Dennis Shambaugh characterized Taylor as having become "a general distraction to our business operations," (Shambaugh Aff. ¶ 7). Finally, Kim Turns stated that Taylor would have "meltdowns from time to time in which he would be outside my office slamming things, huffing and puffing and walking hard as through his feet were slamming into the ground." (Turns Aff. ¶ 5.) None of these allegations is materially more specific than Taylor's general denial that he was not disruptive.

Defendants' best evidence of a legitimate non-discriminatory reason for terminating Taylor comes from Kim Turns and Heidi Vega both of whom aver that Taylor told them that he had sympathy for the Virginia Tech shooter because no one took the shooter seriously. (Vega Aff. ¶ 11; Turns Aff. ¶ 12.) However, in his deposition, Taylor denies that he ever made these comments. He states the following:

> Q: Do you remember telling Kim Turns that shortly after the Virginia Tech massacre that you could sympathize and empathize with the shooter?
> A: No I never said that. . . . That's false statements, [sic] no.
>
> . . .
>
> [Q:] [D]o you recall saying to Kim Turns that you could understand why the shooter in the Virginia Tech massacre did what he did because no one took his complaints seriously either?
> [A:]  Never.

(Doc. 51, Pl.'s Ex. 1, Taylor Dep. at 84:9-16; 85:17-22.)

Thus, the proffered reasons for Taylor's termination—his general disruptiveness and his statements regarding the Virginia Tech massacre—are directly contradicted by Taylor's statements that he was not disruptive and that he never made comments concerning the Virginia Tech massacre. These contradictions are sufficient to create credibility questions that cannot be resolved on summary judgment. *See Scully v. US WATS, Inc.*, 238 F.3d 497, 506 (3d Cir. 2001) (stating that "[c]redibility determinations are the unique province of a fact finder" (citations and internal quotes omitted)). Taylor has come forward with evidence that, if believed by the jury, could nullify Defendants' proffered non-discriminatory reasons for his termination. If a jury believes Taylor—that he was not disruptive and that he never made comments regarding the Virginia Tech massacre instead of Defendants' witnesses who say that he was disruptive and did make comments regarding the Virginia Tech massacre—it would be reasonable for them to "disbelieve [JFC's] articulated legitimate reasons or . . . believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of [JFC's] action." *Fuentes*, 32 F.3d at 765. Accordingly, the court concludes that Taylor has adduced sufficient evidence to create a genuine issue of material fact precluding summary judgment on his claims of retaliation under Title VII and the PHRA.[8]

## 2. **Section 1985**

_____

[8]The court will permit Plaintiff's Title VII and PHRA claims to proceed against Defendant JFC but not against Defendants Shambaugh, Goth, and Scott. In his brief in opposition to Defendants' motion for summary judgment, Plaintiff concedes that Title VII does not permit actions against the individual Defendants, and that he did not plead a violation of the PHRA against the individual Defendants. (Doc. 49, Pl.'s Br. in Opp. to Mot. for Summ. J. at 17.) Thus, to the extent that there is any ambiguity, the court will grant Defendants Shambaugh, Goth and Scott's motion for summary judgment as to Plaintiff's claims under Title VII and the PHRA.

Taylor alleges that Defendants JFC, Scott, Goth, and Shambaugh (collectively the "JFC Defendants") violated 42 U.S.C. § 1985 by conspiring to fire him because of his race. Under § 1985, Taylor must demonstrate that (1) there was a conspiracy by the JFC Defendants designed to deprive him of his federally protected rights; (2) Defendants committed an overt act in furtherance of that conspiracy; (3) Plaintiff's rights were violated as a result of this action; and, (4) Defendants' actions were motived by racial or otherwise class-based invidiously discriminatory animus. *See Griffin v. Breckenridge*, 403 U.S. 88, 103 (1971). Proof of conspiracy is an essential element of an action under 42 U.S.C. § 1985, and it is insufficient for Taylor to show merely that the JFC Defendants had a common goal or acted in concert; rather, Taylor must show through specific facts that the JFC Defendants reached an understanding or agreement to violate his civil rights. *See Martin v. Del. Law Sch. of Widener Univ.*, 625 F. Supp. 1288 (D. Del. 1985), *judgment aff'd*, 884 F.2d 1384 (3d Cir. 1989). In order to prove the existence of a civil conspiracy, Taylor must show that the conspirators agreed to inflict injury upon him; in other words, that they acted with a single plan, the general nature and scope of which was known to each conspirator. *See Green v. Benden*, 281 F.3d 661 (7th Cir. 2002).

The record before the court is completely devoid of any evidence supporting a claim of conspiracy. Taylor has come forward with no evidence that the JFC Defendants acted in concert to violate his civil rights. The mere fact that Defendants may have deliberated about whether to terminate Taylor is insufficient to state a claim under § 1985. Accordingly, the JFC Defendants are entitled to summary judgment on Taylor's § 1985 claims.

### 3. <u>Intentional Infliction of Emotional Distress</u>

Taylor claims that the JFC Defendants' conduct in terminating him and causing him to be arrested for trespassing constitutes intentional infliction of emotional distress. A claim for intentional infliction of emotional distress requires Taylor to prove that the JFC Defendants' conduct: (1) was intentional or reckless; (2) was extreme and outrageous; (3) actually caused the distress; and (4) caused distress that was severe. *Regan v. Twp. of Lower Merion*, 36 F. Supp. 2d 245, 250 (E.D. Pa. 1999) (citations omitted). In order to state a cognizable claim, the conduct must be "so extreme in nature as to go beyond all possible bounds of decency such that it would be regarded as utterly intolerable to [a] civilized society." *Mulgrew v. Sears Roebuck & Co.*, 868 F.Supp. 98, 103 (E.D. Pa. 1994). As the Supreme Court of Pennsylvania has stated, "'it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress.'" *Hoy v. Angelone*, 720 A.2d 745, 755 (Pa. 1998) (quoting *Cox v. Keystone Carbon*, 861 F.2d 390, 395 (3d Cir. 1988)).

In his brief in opposition to summary judgement, Taylor contends that his intentional infliction of emotional distress claim arises from his pretextual termination and the accusations leveled at him by the JFC Defendants. Taylor asserts that these actions meet the standards set out in *Hoy, supra.* The court disagrees. In *Hoy*, the plaintiff was subjected to various forms of abusive treatment, including "sexual propositions, vile and filthy language, off-color jokes, physical [groping], and the posting of sexually suggestive pictures," which ultimately required the plaintiff to take medical leave and seek psychiatric treatment. *Hoy*, 720 A.2d at 747. The Pennsylvania Supreme Court found that these facts were

insufficient as a matter of law to constitute the intentional infliction of emotional distress. *Id.* at 755. The allegations by Taylor in this case are far less severe, and the court finds, based on the evidence in the record, that no factfinder could reasonably conclude that the JFC Defendants' conduct—even resolving all inferences in favor of Taylor—was "so extreme in nature as to go beyond all possible bounds of decency such that it would be regarded as utterly intolerable to [a] civilized society." *Mulgrew*, 868 F.Supp. at 103.

Courts in Pennsylvania have been chary to allow a claim for intentional infliction of emotional distress, and have done so only in the most extreme circumstances. *See e.g. Banyas v. Lower Bucks Hosp.,* 437 A.2d 1236 (Pa. Super. 1981) (defendants intentionally fabricated records to suggest that the plaintiff had killed a third party which led to plaintiff being indicted for homicide); *Chuy v. Phila. Eagles Football Club,* 595 F.2d 1265 (3d Cir. 1979) (defendant's team physician released to press information that plaintiff was suffering from a fatal disease, when physician knew such information was false). Taylor's claim does not rise to anywhere near this level. Accordingly, Taylor has failed to satisfy his burden of raising a triable issue of fact as to his claim for intentional infliction of emotional distress, and the court will grant the JFC Defendants' motion for summary judgment as to that claim.

### 4. Civil Conspiracy

Although anything but clear, Taylor's complaint also appears to assert a claim for common law civil conspiracy between Defendant Shambaugh and the Swatara Township Police Department—a non-party. Defendant Shambaugh contends that there is no evidence in the record supporting Taylor's contention that

he conspired with the Swatara Township Police Department or any of its officers to deprive Taylor of anything. The court agrees.

Under Pennsylvania law, to establish a civil conspiracy a plaintiff must show that "two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means." *Scully v. US WATS, Inc.,* 238 F.3d 497, 516 (3d Cir. 2001) (citations omitted)). This showing "'may be proved by acts and circumstances sufficient to warrant an inference that the unlawful combination had been in point of fact formed for the purpose charged. While conspiracy may be proved by circumstantial evidence, the evidence must be full, clear and satisfactory. . . . Mere suspicion or the possibility of guilty connection is not sufficient, nor proof of acts which are equally consistent with innocence.'" *Id.* (quoting *Fife v. Great Atl. & Pac. Tea Co.*, 52 A.2d 24, 27 (Pa. 1947)).

Under this standard, the record does not support a finding of civil conspiracy. Taylor has come forward with no evidence from which a jury could reasonably infer that Defendant Shambaugh and members of the Swatara Township Police Department conspired to do an unlawful act. Taylor's *belief* that his arrest for trespassing had to have resulted from a conspiracy does not constitute evidence and is insufficient as a matter of law. *Id.* Accordingly, the court will grant Defendant Shambaugh's motion for summary judgment as to Taylor's claim for common law civil conspiracy.

### 5. **First Amendment Claim**

Taylor contends that Defendants Shambaugh and Zimmerman violated his First Amendment rights when he was arrested for trespassing in retaliation for "expressing himself to the police." (Doc. 17 ¶ 58.) In his brief in opposition to

Defendants' motion for summary judgment, Taylor puts it this way: "Taylor [] was charged because he went to the police, explained the situation, and got charged with a crime for doing that." (Doc. 49 at 19.)

In *Hartman v. Moore*, 547 U.S. 250, 258 (2006), the Supreme Court held that, in a case in which the plaintiff is alleging a claim of First Amendment retaliation in the form of an arrest and prosecution, the plaintiff must also plead and prove the absence of probable cause supporting the prosecution. Plaintiff has neither pled nor proven the absence of probable cause. This alone is sufficient to defeat Taylor's claim; however, his claim is fatal for a more significant reason: It is barred by his agreement to perform community service in exchange for expungement of his arrest.

In *Heck v. Humphrey*, 512 U.S. 477 (1994) the Supreme Court announced what is called the "favorable termination rule," which forecloses certain § 1983 actions for plaintiffs who have plead guilty to criminal charges. In *Heck*, the Supreme Court stated:

> [I[n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus. . . . A claim for damages bearing relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983.

*Id.* at 486-87 (emphasis in original). The final termination rule announced in *Heck* also bars those § 1983 claims that have the effect of impugning the underlying criminal conviction. *See Marable v. Pottstown Twp.*, 176 F. App'x 275, 281 (3d Cir.

2006).  Here, Taylor agreed to perform community service in exchange for having his arrest expunged.  Taylor admitted in his deposition that there was a *quid pro quo* involved in this arrangement in that he had to complete community service before his arrest record would be expunged.  (Doc. 27-3, Defs.' Ex. J, Taylor Dep. at 58:4-12; 59:8-16.)  There is no debate that Taylor performed his community service and that his record was expunged; the only disagreement is the effect that all of this has upon his ability to maintain a § 1983 claim.  Defendant Shambaugh argues that Taylor's claims are barred by the Third Circuit case *Gilles v. Davis*, 427 F.3d 197 (3d Cir. 2005), which interpreted *Heck* to preclude § 1983 claims where the underlying criminal charge was expunged after participation in the accelerated rehabilitative disposition ("ARD") program.  Taylor argues simply that since he is not asserting a malicious prosecution claim that *Heck* is inapplicable.  The court agrees with Defendant Shambaugh and disagrees with Taylor.

In *Gilles*, the plaintiff was cited and charged with disorderly conduct ancillary to his speech activity.  He voluntarily participated in an the ARD program which expunged his criminal citation upon completion of the program.  *Id.* at 202.  The plaintiff subsequently brought a claim under § 1983 alleging First Amendment retaliation against the officers who arrested him.  *Id.*  The Third Circuit rejected these claims and held that "the ARD program is not a favorable termination under *Heck*," and thus, the plaintiff's claims were barred by the favorable termination doctrine.  *Id.* at 211.  Taylor's First Amendment claims fails for the same reasons.  Although it is not clear that Taylor actually participated in ARD, it is clear that the expungement of his arrest was conditioned upon his having performed community service.  (Doc. 27-3, Defs.' Ex. J, Taylor Dep. at 58:4-12; 59:8-16.)  Like the plaintiff in *Gilles*,

Taylor's agreement to perform community service in exchange for expungement placed burdens upon him that were "not consistent with innocence," and is unlike the exceptions announced in *Heck* that would permit a § 1983 claim to proceed. *Gilles*, 427 F.3d at 211. Accordingly, consistent with the principles announced in *Heck* and *Gilles,* the court finds that Taylor's decision to accept community service in exchange for expungement bars his § 1983 claim for First Amendment retaliation, and the court will grant Defendant Shambaugh's motion for summary judgment on this claim.

## II.        Defendant Zimmerman's motion to dismiss

Defendant Brian Zimmerman filed a motion to dismiss Plaintiff's Second Amended Complaint on August 14, 2009. (Doc. 22.) The only claim against Defendant Zimmerman is that he violated Taylor's First Amendment rights by approving the charge of trespassing. For the purpose of deciding Defendant Zimmerman's motion to dismiss, the court incorporates the facts as alleged in Taylor's Second Amended Complaint.[9] (Doc. 17.)

_____

[9]Specifically, Taylor states the following facts that are relevant to Zimmerman's motion to dismiss:

> 53. On April 22, 2007 the defendant Zimmerman approved charges prepared by Lex to charge Taylor with Trespass.
> 54. On June 14, 2007 plaintiff was brought to trial in front of D.J. Michael J. Smith and upon advice of counsel at that time . . . agreed to do 15 hours of community service after which the matter would be expunged.
> 55. In his reports to Zimmerman Jason Lex indicated Taylor "lied to police."

(continued...)

Because the only claim against Defendant Zimmerman arises from Taylor's arrest and subsequent agreement to perform community service in exchange for expungement of his arrest, the court concludes that this claim is barred by *Heck* and *Gilles* for the same reasons that this claim was barred against Defendant Shambaugh. The court need not reiterate here what it stated earlier, and will grant Zimmerman's motion to dismiss Taylor's complaint for the reasons set forth in Part I.D.5, *supra.* Consistent with the principles announced by the Supreme Court in *Heck* and the Third Circuit *Gilles,* the court finds that Taylor's decision to accept community service in exchange for expungement bars his § 1983 claim for First Amendment retaliation. Accordingly, Taylor's Second Amended Complaint fails to state a cause of action against Defendant Zimmerman upon which relief can be granted, and the court will grant Zimmerman's motion to dismiss.[10] The court will not permit Taylor to further amend his complaint. Any amendment as to Zimmerman would be futile and only serve to delay a case that is ready for trial.

---

[9](...continued)
56. Plaintiff emphatically denies he "lied" to the police or anyone else.
57. Further, plaintiff alleges he was charged by Lex and Zimmerman who "approved" Lex's charges because he asked the police for help and engendered displeasure merely because Shambaugh was upset.
58. Plaintiff suffered retaliation merely for expressing himself to the police.
59. The police officers Lex and Zimmerman did no investigation prior to going out to Transcore and entering with Taylor.
60. Plaintiff suffered retaliation merely because he asked the police for help.
61. Absolutely no law enforcement purpose was served by charging plaintiff with trespassing because Lex claimed Taylor was lying.
62. Zimmerman knew Taylor wasn't lying and that he had advised Zimmerman that he needed help to get his belongings.

(Doc. 15, ¶¶ 53-62.)

[10]Because the court will grant Defendant Zimmerman's motion to dismiss, the court will deem moot Defendant Zimmerman's subsequently filed motion to reset the discovery deadlines previously established in this case. (Doc. 32.)

**III.      Conclusion**

Consistent with the foregoing, the court will grant in part and deny in part Defendant JFC Staffing Associates, Jamie Scott, Karen Goth, and Dennis Shambaugh's motion for summary judgment.  That motion is denied only as to Taylor's retaliation claim under Title VII and the PHRA against Defendant JFC.  Specifically, that JFC retaliated against Taylor by terminating his employment.  Defendants' motion will be granted as to all other claims against all other parties.  No claims remain against Defendant's Scott, Goth, and Shambaugh.  No claims remain against Defendant JFC for alleged violations of §§ 1981 and 1985 or any Title VII and PHRA claims arising from Plaintiff's claims of discrimination and hostile work environment.  All of Plaintiff's state law claims also fail as a matter of law.

The court will also grant Defendant Zimmerman's motion to dismiss Plaintiff's Second Amended Complaint.  All claims against Defendant Zimmerman will be dismissed.  Because Defendant Zimmerman is dismissed as a party from this case, his motion to reset deadlines previously established will be deemed moot.  The court will issue an order consistent with this memorandum.

                                        s/Sylvia H. Rambo
                                        SYLVIA H. RAMBO
                                        United States District Judge

Dated:  December 30, 2009.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DEWITT TAYLOR,                          :
                                        :
            **Plaintiff**                   :
                                        :
     **v.**                                 :
                                        :     **CIVIL NO.1:CV-08-1610**
**JFC STAFFING ASSOCIATES;**                :
**KAREN GOTH; JAMIE SCOTT**                 :
**DENNIS SHAMBAUGH; and**                   :
**JAMES ZIMMERMAN,**                        :
                                        :
            **Defendants**                  :

## O R D E R

In accordance with the accompanying memorandum of law, **IT IS
HEREBY ORDERED THAT**:

(1) Defendant JFC Staffing Associates, Karen Goth, Jamie Scott, and
Dennis Shambaugh's motion for summary judgment, (Doc. 27), is **GRANTED IN
PART AND DENIED IN PART** as follows:

(a) the motion is **DENIED** as to Plaintiff's retaliation claim under
the anti-retaliation provision in § 2000e-3(a) of Title VII of the Civil Rights Act of
1964, and the analogous provision under the Pennsylvania Human Relations Act
against Defendant JFC Staffing Associates;

(b) the motion is **GRANTED** as to all other claims against
Defendant JFC Staffing Associates;

(c)  the motion is **GRANTED** as to all claims against Defendants
Karen Goth, Jamie Scott, and Dennis Shambaugh;

(2)     Defendant Brian Zimmerman's motion to dismiss, (Doc. 22), is
**GRANTED**.  All claims against Defendant Zimmerman are dismissed.

(3)     Defendant Brian Zimmerman's unopposed motion to reset deadlines previously established, (Doc. 32), is **DEEMED MOOT**.

(4)     The clerk of court shall defer entry of judgment until completion of the trial on Plaintiff's retaliation claim.

(5)     The court will separately issue a new scheduling order setting a date and time for the pretrial conference, deadlines for pretrial memoranda, and motions in limine, as well as a date and time for jury selection on Plaintiff's sole remaining claim.

s/Sylvia H. Rambo
SYLVIA H. RAMBO
United States District Judge

Dated:  December 30, 2009.